

**GEORGE LEE JONES,**

      Plaintiff,

v.                                        Civil Action No. **3:16CV19**

**DR. INDER JEET SINGH GUJRAL,**

      Defendant.

## MEMORANDUM OPINION

George Lee Jones, a Virginia inmate proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983.[1] Jones alleges that Defendant Dr. Inder Jeet Singh Gujral ("Defendant Gujral"), a physician at Sussex II State Prison, was deliberately indifferent to his medical needs in violation of the Eighth Amendment.[2] (Compl. 4, ECF No. 1.)[3] By Memorandum Order entered on September 5, 2017, the Court denied without prejudice Defendant's Motion for Summary Judgment. (ECF No. 31.) The matter is now before the Court on the Defendant's Second Motion for Summary Judgment. ("Motion for Summary Judgment,"

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[3] The Court employs the pagination assigned by the CM/ECF docketing system for citations to Jones's submissions. The Court corrects the capitalization and punctuation from Jones's submissions.

ECF No. 32.) Jones has responded. (ECF No. 36.) The matter is ripe for disposition. For the reasons stated below, the Court will GRANT Defendant Gujral's Motion for Summary Judgment.

## I.  SUMMARY OF CLAIMS

Jones claims that Defendant Gujral was deliberately indifferent to his medical condition, known as Sjögren's Syndrome, in the course of his detention at Sussex II State Prison. In his sworn complaint, Jones alleges that as a result of his Sjögren's Syndrome, he "experiences joint pain, swelling and stiffness, swollen saliva glands, skin rashes or dry skin, and prolonged fatigue." (Compl. 4.) Jones further alleges that "despite [his] history of suffering and plea for help, Defendant Dr. Gujral refuse[d] to address him with adequate treatment and/or a referral to an outside specialist, effectively subjecting [him] to the unnecessary and wanton infliction of pain and denial of adequate medical care in violation of [his] constitutional rights." (*Id.* at 6.) The Court construes Jones's Complaint to raise the following claims:

| | |
|---|---|
| Claim 1: | Defendant acted with deliberate indifference by failing to treat Jones's Sjögren's Syndrome (*id.*); |
| Claim 2: | During the two years that Jones was under Defendant's care, Defendant acted with deliberate indifference by failing to provide continuous treatment and adequate care for Jones's symptoms related to his Sjögren's Syndrome, namely:<br>(a) "dry eyes," (*id.* at 4.);<br>(b) "dry mouth," (*id.*);<br>(c) "joint pain, swelling and stiffness," (*id.*);<br>(d) "swollen saliva glands," (*id.*);<br>(e) "skin rashes or dry skin," (*id.*);<br>(f) "prolonged fatigue," (*id.*);<br>(g) "limited mobility and is mostly confined to a wheelchair," (*id.*); and,<br>(h) "constant pain and discomfort . . . [which] prohibit[s] him from enjoying the normal 6 to 7 hours of undisturbed sleep." (*Id.*) |
| Claim 3: | Defendant acted with deliberate indifference by failing to refer Jones to a specialist to treat Jones's Sjögren's Syndrome or the symptoms related to Jones's Sjögren's Syndrome. (*Id.* at 5.) |

2

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted).  When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).  In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  However, a mere "*scintilla* of evidence" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).  Nor can a nonmoving party "create a genuine dispute of fact through mere speculation." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.3d 213, 214 (4th Cir. 1985)).  Accordingly, "[t]he nonmovant can show that a dispute is genuine only if it provides sufficient evidence so that a 'reasonable jury could return a verdict for the nonmoving party.'" *Wiggins v. DaVita Tidewater LLC*, 451 F. Supp. 2d 789, 796 (E.D. Va. 2006) (quoting *Anderson*, 477 U.S. at 248).

In support of his Motion for Summary Judgment, Defendant Gujral has submitted his own declaration (Mem. Supp. Mot. Summ. J. Attach. 1 ("Gurjal Decl."), ECF No. 33–1). With his previous Motion for Summary Judgment, Defendant Gujral submitted Jones's pertinent medical records. ("Med. Rec.," ECF Nos. 23–2 through 23–3). Jones has submitted a sworn Complaint (ECF No. 1, at 8), copies of grievances he filed with the Virginia Department of Corrections ("VDOC"), and letters he has written to various officials. (ECF Nos. 20–2 through 20–4). Further, in response to Defendant Gujral's first Motion for Summary Judgment, Jones submitted his own affidavit. ("Jones Aff.," ECF No. 28, at 5.) The Court will consider these submissions in determining the propriety of summary judgment. *See* Fed. R. Civ. P. 56(c). In light of the foregoing submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Jones.

### III.    UNDISPUTED FACTS

On February 5, 2014, Jones was transferred from Nottoway Correctional Center to Sussex II State Prison ("Sussex II"). (Gujral Aff. ¶ 7.) Defendant Gujral began working as a physician at Sussex II in March 2014. (Compl. 4; Gujral Aff. ¶ 2.) Jones is an obese, 80-year-old man "in poor health with many longstanding or chronic medical issues." (Gujral Aff. ¶ 7.) Specifically, Jones suffers from Type II diabetes, glaucoma, renal insufficiency, coronary artery disease with a history of congestive heart failure, mobility issues, and Sjögren's Syndrome. (*Id.*; *see* Compl. 4.) Sjögren's Syndrome is an autoimmune disorder. (Gujral Aff. ¶ 5.) Sjögren's Syndrome's most common symptoms are dry eyes and dry mouth. (*Id.*) Other symptoms of Sjögren's Syndrome include, "joint pain, swelling, and stiffness, swollen salivary glands, skin rashes or dry skin, persistent dry couch, and prolonged fatigue." (*Id.*) Treatment of Sjögren's Syndrome is essentially treatment of its symptoms, as there is no cure for Sjögren's Syndrome.

(*Id.*) Many patients with Sjögren's Syndrome "manage their symptoms with over-the-counter eyedrops and increasing water intake. In addition, non-steroidal anti-inflammatory drugs ('NSAIDs') and other arthritis medications are commonly prescribed for symptoms related to joint pain, swelling, and stiffness." (*Id.*)

In early February 2014, Jones's medications included: aspirin, Isosorbide, Lisinopril, a multivitamin, Lasix, and Insulin. (*See id.* ¶ 7.) Isosorbide "is used to treat chest pain," (*id.*), Lisinopril "is an ACE inhibitor used to treat high blood pressure and heart failure," (*id.*), and Lasix "is a diuretic used to treat fluid retention and swelling (edema) caused by congestive heart failure, liver disease, kidney disease, and other medical conditions." (*Id.*) Jones was prescribed Insulin to treat his diabetes. (*Id.*)[4]

---

[4] In the interests of judicial economy, the remainder of the undisputed facts underlying Jones's claims will be recited in the Analysis portion of the Memorandum Opinion. *See supra* Part IV. Additionally, Local Civil Rule 56(B) provides:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B). As Jones failed to respond to the Motion for Summary Judgment with a section listing facts he alleges are in dispute, the Court largely relies upon the facts set forth in the Respondent's Statement of Undisputed Facts. (*See* Mem. Supp. Mot. Summ. J. 2–14, ECF No. 33.)

Finally, the Court notes that although it primarily addresses the various medical treatments that Jones received for each of his symptoms of Sjögren's Syndrome in this Memorandum Opinion, the record establishes that Jones received a plethora of other treatments and medications for his other ailments.

# IV.   ANALYSIS

## A.   Eighth Amendment Standard

To survive a motion for summary judgment on an Eighth Amendment "cruel and unusual punishment" claim, Jones "must prove two elements: (1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). An inmate must demonstrate both that "the prison official acted with a sufficiently culpable state of mind (subjective component) and . . . the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Id.* (citing *Wilson*, 501 U.S. at 298–300). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.'" *Williams*, 77 F.3d at 761 (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that the defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson*, 503 U.S. at 9 (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that

which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

**B.    Claim 1**

In Claim 1, Jones contends that Defendant Gujral acted with deliberate indifference by failing to treat Jones's Sjögren's Syndrome and its symptoms. (Compl. 6.)  In his Complaint, Jones alleges that on more than one occasion, Defendant Gujral refused to examine him because Jones had filed grievances against him. (Compl. 5.)  Jones admits, however, that he has received some medical treatment but contends that those treatments were "in connection with other medical ailments that are unrelated to [his] Sjögren's Syndrome, like arthritis and diabetes." (Jones Aff. 1.)

Jones suffers from Type II diabetes, glaucoma, renal insufficiency, coronary artery disease with a history of congestive heart failure, mobility issues, as well as Sjögren's Syndrome. (Gujral Aff. ¶ 7.)  Sjögren's Syndrome is an autoimmune disorder and its most common symptoms are dry eyes and dry mouth.  (*Id.* ¶ 5.)  Other symptoms of Sjögren's Syndrome include, "joint pain, swelling, and stiffness, swollen salivary glands, skin rashes or dry skin, persistent dry couch, and prolonged fatigue." (*Id.*)  Treatment of Sjögren's Syndrome is essentially treatment of its symptoms, as there is no cure for Sjögren's Syndrome. (*Id.*)

The record establishes that Jones received medical care for the symptoms of his Sjögren's Syndrome from Defendant Gujral and other doctors at Sussex II.  Although Jones complained in his VDOC grievances that he was not being treated for the "root cause" of his Sjögren's Syndrome (ECF No. ECF No. 20–2, at 1), Sjögren's Syndrome has no cure. (Gujral Decl. ¶ 5.) A failure to cure an incurable medical condition does not violate the Eighth Amendment. *See Jones v. McRee*, No. 4:15–3273–RMG, 2016 WL 4967765, at *2 (D.S.C. Sept. 16, 2016).

Nonetheless, in his sworn Complaint, Jones avers that "[d]uring several visits to [Defendant Gujral], [Jones] was unable to speak with Defendant Dr. Gujral because when the doctor saw [Jones] he said, 'Oh you have complaints against me,' and walked out of the examination room without examining [Jones]." (Compl. 5.) Jones then states "Defendant Dr. Gujral has a pattern of refusing to examine prisoners . . . who had filed informal complaints against him as [Jones] is aware of at least two other instances . . . ." (*Id.* at 6.) Jones fails to create a genuine dispute of fact regarding Defendant Gujral's refusal to treat him because Jones filed grievances against him. Specifically, Jones's vague statement that Defendant Gujral refused to see him at several unidentified times fails to create sufficient doubt to counter Defendant Gujral's sworn testimony and Jones's medical records that Defendant Gujral treated Jones for his various ailments—including his Sjögren's Syndrome—on numerous occasions. *See Longleaf in Vinings Homeowners Ass'n, Inc. v. QBE Ins. Corp.*, No. 1:13–CV–03132–AT, 2015 WL 11232360, at *7 (N.D. Ga. Mar. 12, 2015) (concluding party's affidavit failed to create a genuine dispute of fact where it contained "only a vague description of events and time sequence"), *aff'd*, 646 F. App'x 823 (11th Cir. 2016); *see also Smith v. Pope*, No. CV512–021, 2013 WL 6989774, at *2 (S.D. Ga. July 15, 2013) (concluding plaintiff failed to create a genuine dispute over whether he received medical care for his back where he failed to dispute defendant's evidence establishing the medical care provided for his back), *adopted by*, No. CV512–021, 2013 WL 6057943 (S.D. Ga. Nov. 15, 2013).

Further, Defendant Gujral avers that "arthritis medications are commonly prescribed for [Sjögren's Syndrome] symptoms related to joint pain, swelling, and stiffness." (Gujral Decl. ¶ 5.) Jones however, argues that the treatments he has received were "in connection with other medical ailments . . . like arthritis." (Jones Aff. 1). Jones, as a lay person without any medical

training or experience, cannot provide such a medical opinion. *See Herrington v. Hodge*, No. 2:12–cv–01648–AC, 2016 WL 4361526, at *2 (D. Or. Aug. 12, 2016), *aff'd*, 692 F. App'x 379 (9th Cir. 2017); *Scheckells v. Goord*, 423 F. Supp. 2d 342, 348 (S.D.N.Y. 2006). Further still, such a "[d]isagreement[] between an inmate and a physician over the inmate's proper medical care do[es] not state a § 1983 claim." *Wright*, 766 F.2d at 849; *see Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not subject to judicial review.").

Finally, as detailed more below, Jones received a great deal of medical care for his symptoms of Sjögren's Syndrome of which he complained. Prior to seeing Defendant Gujral, in February and March 2014, Jones was provided, among other things, artificial tears, Lasix, Baclofen, Vitamin D, miconazole cream, x-rays, and lab work to treat and investigate his dry eyes, rashes, swelling, and pain. (Gujral Decl. ¶¶ 7, 8, 9, 11, 12 (citations omitted).) Jones also was given a wheelchair. (*Id.* ¶ 9 (citations omitted).) In May of 2014, Jones was prescribed Benadryl, minocycline, and zinc oxide to treat a small rash in his upper medial thighs and groin, and was provided Vitamin D to address his Vitamin D deficiency. (*Id.* ¶ 11 (citation omitted).) Further, beginning with his first visit to Defendant Gujral in July 2014, Jones continued to receive numerous treatments and medications for his Sjögren's Syndrome symptoms and other ailments, including, antibiotic cream, ointments, Vitamin D, Prilosec, Norvasc, Tylenol, Lasix, Flomax, Zanaflax, Isosorbide, Tegretol, potassium, sodium bicarbonate, lab work, x-rays, antiembolic stockings, physical therapy sessions, and referrals to specialists. (*Id.* ¶¶ 13, 15, 16, 17, 19, 20, 25, 27, 29, 31, 33 (citations omitted).) It is clear from Jones's medical records that Jones received a variety of treatments to investigate and address his symptoms of Sjögren's Syndrome, as there is no cure for the disease. Other than his request to be seen by a specialist,

Jones fails to identify with any specificity what additional medical treatment he desired and was denied by Defendant Gujral.[5] (*See* Compl. 7.)

Jones simply lacks entitlement to the medical care of his choosing. *Hudson*, 503 U.S. at 9 (citing *Estelle*, 429 U.S. at 103–04.) The record establishes that Defendant Gujral provided Jones with medical care for the symptoms of his Sjögren's Syndrome and that his treatment was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851 (citation omitted). Accordingly, Claim One will be DISMISSED.

### C. Claim 2

In Claim 2, Jones next contends that Defendant Gujral acted with deliberate indifference by failing to provide continuous and adequate care for Jones's symptoms related to his Sjögren's Syndrome, namely: "dry eyes," (Compl. 4.); "dry mouth," (*id.*); "joint pain, swelling and stiffness," (*id.*); "swollen saliva glands," (*id.*); "skin rashes or dry skin," (*id.*); "prolonged fatigue," (*id.*); "limited mobility and is mostly confined to a wheelchair," (*id.*); and, "constant pain and discomfort . . . [which] prohibit[s] him from enjoying the normal 6 to 7 hours of undisturbed sleep." (*Id.*)

As stated above, only deprivations of medical care that are objectively sufficiently serious are actionable under the Eighth Amendment. *See Johnson*, 145 F.3d at 167; *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) ("Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim."). Further, because Jones complains of Defendant Gujral's treatment of his various Sjögren's Syndrome symptoms, Jones must demonstrate that Defendant Gujral had actual knowledge of each of the symptoms of which he

---

[5] The Court addresses Jones's allegation that he has been denied a referral to a specialist in Part IV.D.

now complains and that Defendant Gujral subjectively choose to ignore or inadequately treat those symptoms. *See Jehovah v. Clarke*, 798 F.3d 169, 181–82 (4th Cir. 2015). At this juncture, such a showing requires Jones to produce evidence that Defendant Gujral subjectively recognized that his treatment for Jones's complained-of symptoms of was inadequate. *See Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 211–12 (4th Cir. 2017).

### i. Dry Eyes and Dry Mouth

In Claim 2(a), Jones complains that he did not receive adequate and continuous medical care for his dry eyes and mouth. To begin, the Court doubts whether a failure to adequately treat symptoms of dry eyes and a dry mouth alone is "sufficiently serious" enough to trigger Eighth Amendment protection. *See Reeves v. Hudson Co. Jail Med. Dep't*, No. 09–2791 (KSH), 2011 WL 2610123, at *8 (D.N.J. June 30, 2011). Nevertheless, Jones fails to demonstrate that Defendant Gujral was deliberately indifferent to these symptoms.

On February 17, 2014, Jones first complained to Dr. Tesemma about his dry eyes. (Gujral Decl. ¶ 8 (citing Med. Rec. 118).)[6] Dr. Tesemma advised that Jones use artificial tears, which were readily available from the nurse. (*Id.; see id.* ¶ 20.) Dr. Tesemma also referred Jones to the eye doctor. (Gujral Decl. ¶ 8 (citation omitted).) On December 3, 2014, Jones had an eye exam with Dr. Spruill.[7] (*Id.* ¶ 20 (citing Med. Rec. 33).) Dr. Spruill recommended artificial tears for Jones's dry eyes. (*Id.* (citation omitted).) In July of 2015, Jones refused an eye exam. (*Id.* ¶ 30 (citing Med. Rec. 63).) On August 14, 2015, after meeting with Jones for

---

[6] The Court employs the "MR–000001," which is the pagination assigned to the Medical Records by the Virginia Department of Corrections. However, the Court omits the initial zeros from the pagination when referring to the Medical Records.

[7] It appears that between meeting with Dr. Tesemma in February 2014 and Dr. Spruill in December 2014, Jones did not complain of dry eyes at his various medical appointments. (*See* Gujral Decl. ¶¶ 14, 18, 19, 24.)

the last time,[8] Defendant Gujral renewed Jones's medications, including his artificial tears. (*Id.* ¶ 33 (citing Med. Rec. 49.).) Jones does not point to any instance when he complained to Defendant Gujral about his dry eyes or dry mouth.

The record establishes that Jones never complained of dry eyes or dry mouth to Defendant Gujral, or that Jones ever informed Defendant Gujral that he was not receiving artificial tears from the nurse as recommended by other doctors at Sussex II. (Gujral Decl. ¶¶ 14, 18, 19, 25, 35 (citations omitted).) In fact, the record demonstrates that on the numerous occasions when Defendant Gujral examined Jones for his other ailments, he did not observe anything abnormal about Jones's eyes or mouth. (*See* Gujral Decl. ¶¶ 14, 18, 19, 25 (citations omitted).) Although Defendant Gujral renewed Jones's artificial tears in combination with his other medications after their last visit, Jones fails to demonstrate that Defendant Gujral had actual knowledge of his dry eyes and mouth during the course of his treatment of Jones. *See Iko*, 535 F.3d at 241 (citation omitted) (explaining that "*actual knowledge of the risk of harm to the inmate is required*" for a deliberate indifference claim).

Moreover, in assessing a claim of deliberate indifference, the Court must also consider the totality of the medical care provided, rather than simply what additional treatment the inmate was denied. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)). Jones fails to suggest what more Defendant Gujral should have done to treat his dry eyes and or mouth, and the record establishes that Jones received reasonable treatment for his dry eyes in the form of artificial tears. *See Cummings v. MDOC Bureau of Health Care Servs.*, No. 2:13–CV–245, 2013 WL 5890688, at *3 (W.D. Mich. Nov. 4, 2013).

---

[8] The record is unclear as to why August 14, 2015 was the last time that Defendant Gujral met with Jones. It appears, however, that since the filing of this action, Jones was transferred from Sussex II. (*See* ECF Nos. 16, 35.)

The record establishes that Defendant Gujral was never informed by Jones that he was suffering from dry eyes and mouth, and that Defendant Gujral was not deliberately indifferent these symptoms.[9] Accordingly, Claim 2(a) will be dismissed.

### ii.    Joint Pain, Swelling, and Stiffness

In Claim 2(b), Jones complains that Defendant Gujral was deliberately indifferent to his symptoms of joint pain, swelling, and stiffness. (Compl. 4.) However, the record establishes that Defendant Gujral and other doctors at Sussex II regularly ordered treatments for Jones's joint pain, swelling, and stiffness—whether it was a symptom of his Sjögren's Syndrome or due to fluid retention—and that they monitored Jones's medications accordingly.

On February 17, 2014, shortly after arriving at Sussex II, Jones was seen by Dr. Tesemma for several issues, including his Sjögren's Syndrome and muscle cramps in his legs. (Gujral Decl. ¶ 8 (citing Med. Rec. 118).) Dr. Tesemma advised Jones to use a wheelchair, and continued Jones's medications (aspirin, Isosorbide, Lisinopril, a multivitamin, Lasix, and Insulin (*id.* ¶ 7)), and added Baclofen for thirty days. (*Id.* ¶ 8.) Lasix "is a diuretic used to treat fluid retention and swelling (edema) caused by congestive heart failure, liver disease, kidney disease, and other medical conditions," (*id.* ¶ 7), and Baclofen "is used to treat muscle spasms." (*Id.* ¶ 8.)

In March 2014, Jones was on potassium supplements. (*Id.* ¶ 9.) Potassium assists with water balance and nerve impulses, and a severe potassium deficiency can cause muscle spasms

---

[9] The record also reflects that, on at least one occasion, Jones refused an eye exam. (Gujral Decl. ¶ 30 (citing Med. Rec. 63).) In his Affidavit, Jones avers that he "ha[s] never declined any [medical] treatment." (Jones Aff. 1.) Jones's vague statement that he has never refused any type of medical treatment fails to establish a question of material fact when the record establishes otherwise. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (alteration in original) (internal quotation marks omitted) (citations omitted) (observing that "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment") (alterations in original; internal quotation marks omitted); *Bennett v. Reed*, 534 F. Supp. 83, 87 (E.D.N.C. 1981) ("In determining whether a prison official is deliberately indifferent to a prisoner's serious medical needs, a court may generally rely on medical records concerning examination and treatment of the prisoner.").

and cramping. (*Id.* ¶ 15.) "Too much potassium causes hyperkalemia. Sodium bicarbonate is used to treat hyperkalemia." (*Id.*) On March 31, 2014, Dr. Bankuru discontinued Jones's potassium supplements because Jones's potassium levels had become elevated, indicating he had hyperkalemia. (*Id.* ¶ 9.) Also on March 31, 2014, Jones had an examination with Dr. Tesemma. (*Id.* (citing Med. Rec. 114).) Dr. Tesemma approved a wheelchair pass for Jones, ordered chest x-rays, renal lab work, and a renal ultrasound, and prescribed Norvasc and Lasix. (*Id.* (citing Med. Recs. 114–15).) Norvasc "is a calcium channel blocker and is used to treat high blood pressure and chest pain." (*Id.*) Dr. Tesemma also discontinued Jones's Lisinopril "because it was an ACE inhibitor, which may have been contributing to [Jones's] prerenal azotemia." (*Id.*)

On May 20, 2014, Jones complained to Dr. Tesemma about, among other things, lower back pain and neck pain due to a fall. (*Id.* ¶ 11.) On May 23, 2014, Jones saw Dr. Bakuru who noted Jones was feeling better and had no new complaints, and that he had no lower extremity swelling. (*Id.* ¶ 12 (citing Med. Rec. 36).) Dr. Bankuru also noted Jones had a Vitamin D deficiency, so he added Vitamin D supplements and ordered lab work. (*Id.* (citing Med. Recs. 36, 109).)

On July 7, 2014, Jones met with Defendant Gujral for the first time and Jones had no complaints about his Sjögren's Syndrome or joint pain, swelling, or stiffness. (*Id.* ¶ 13 (citing Med. Rec. 107).) On August 4, 2014, Defendant Gujral saw Jones for complaints of abdominal pain and chest pain, for which he ordered Tylenol and a chest x-ray. (*Id.* ¶ 14 (citing Med. Rec. 103–04).) Jones was not in distress, but his Vitamin D levels were still low, so Defendant Gujral ordered Calcium/Vitamin D (Oscal). (*Id.* (citation omitted).) On August 24, 2014, Defendant Gujral renewed, among other things, Jones's potassium and sodium bicarbonate. (*Id.* ¶ 15 (citing Med. Rec. 102).)

On September 2, 2014, Jones saw the nurse at sick call for complaints of muscle spasms, chronic leg pain, and knee pain, and Jones insisted that he be sent out for treatment. (*Id.* ¶ 16 (citing Med. Rec. 100).) Jones alleged that he had fallen and hit his head but refused Motrin for pain.[10] (*Id.* (citing Med. Rec. 102).) Jones was not sent to the hospital because his vital signs were within range and he had no head trauma. (*Id.* (citing Med. Rec. 102).) On September 8, 2014, Defendant Gujral ordered lab work to test Jones's Vitamin D levels because they had been deficient. (*Id.* (citing Med. Rec. 101.).)

On October 17, 2014, Jones saw nephrologist Dr. Bankuru for an evaluation. (*Id.* ¶ 17 (citing Med. Rec. 35).) Jones complained of swelling in his lower extremities. (*Id.*) To address this, Dr. Bankuru ordered Jones to continue taking Lasix and advised him to avoid salt. (*Id.* (citing Med. Recs. 35, 97).) On October 18, 2014, Defendant Gujral renewed Jones's Norvasc and Lasix prescriptions. (*Id.* ¶ 18 (citing Med. Rec. 98).) On October 21, 2014, Jones met with Defendant Gujral to discuss his lab work and address his various complaints, including cramps in both of his legs. (*Id.* (citing Med. Rec. 96).) Defendant Gujral ordered a sed rate test, urinalysis, and an increase in his dosage of Lasix. (*Id.* (citing Med. Rec. 96).) "Sed rate . . . is a non-specific blood test that can reveal inflammatory activity in the body." (*Id.*) On November 7, 2014, Jones had a urinalysis and his sed rate was marginally high, indicating that he had some inflammation in his body, but it was not significant. (*Id.* (citing Med. Rec. 6).)

On December 1, 2014, Defendant Gujral met with Jones and addressed his complaints of, among other things, swelling in his arms and daily pain in his arms and calves. (*Id.* ¶ 19 (citing Med. Rec. 92).) Defendant Gujral found swelling in Jones's legs and that his sugar was elevated.

---

[10] As stated above, in his Affidavit, Jones avers that he "ha[s] never declined any [medical] treatment." (Jones Aff. 1.) Jones's vague statement that he has never refused any type of medical treatment fails to establish a question of material fact when the record establishes otherwise. *See Roane*, 378 F.3d at 400–01; *Bennett*, 534 F. Supp. at 87.

(*Id.*) Gujral adjusted Jones's insulin dosage. (*Id.* (citing Med. Rec. 92.) During this visit, Jones requested to be sent out to the hospital. (*Id.*) However, Defendant Gujral determined that there was not a medical need for Jones to go to the hospital and noted that he was already taking Lasix for his leg swelling, the appropriate medication. (*Id.*) On December 7, 2014, Defendant Gujral ordered Jones to receive Vitamin D for three months. (*Id.* ¶ 20 (citing Med. Rec. 91).)

On January 12, 2015, Jones complained to Dr. Bankuru about his leg swelling for which Dr. Bankuru continued Jones's Vitamin D and ordered additional Lasix. (*Id.* ¶ 22 (citing Med. Recs. 84, 89).) On January 27, 2015, Defendant Gujral renewed Jones's insulin prescription. (*Id.* (citing Med. Rec. 88).) On January 29, 2015, Defendant Gujral renewed Jones's Vitamin D, multivitamin, and aspirin prescriptions. (*Id.* (citation omitted).)

On February 3, 2015, Defendant Gujral saw Jones for a follow-up, and he continued to complain about abdominal pain. (*Id.* ¶ 23 (citing Med. Rec. 86).) On February 20, 2015, Defendant Gujral renewed Jones's Isosorbide for 180 days. (*Id.* (citing Med. Rec. 86).) On February 23, 2015, Defendant Gujral noted that Jones needed his blood glucose checked because his HgB A1C level was high when recorded on January 24, 2015. (*Id.* (citing Med. Rec. 77).) On February 24, 2015, Defendant Gujral adjusted and reordered Jones's insulin. (*Id.* (citing Med. Rec. 77).)

On March 31, 2015, Defendant Gujral met with Jones again to address his Sjögren's Syndrome symptoms, and specifically, his complaints of weakness and pain in the back of both of his legs. (*Id.* ¶ 25 (citing Med. Rec. 72).) Defendant Gujral noted he was in no acute distress during this visit, and Defendant Gujral found no acute symptoms. (*Id.*) Defendant Gujral ordered x-rays of Jones's knees and explained exercises that Jones could do for his legs. (*Id.*)

Defendant Gujral provided Tylenol for Jones's pain, believing that Tylenol "would be safer on [Jones's] stomach than an NSAID." (*Id.* (citation omitted).)

On April 7, 2015, Jones had x-rays on both knees. (*Id.* ¶ 26 (citing Med. Rec. 71).) On April 17, 2015, Dr. Bankuru continued all of Jones's medications, including Lasix for his leg swelling. (*Id.*) On April 23, 2015, Defendant Gujral renewed Jones's Norvasc, Prilosec, and Vitamin D. (*Id.*) On May 3, 2015, Jones saw Dr. Boyake for complaints of chest and leg pain. (*Id.* ¶ 27 (citing Med. Rec. 70).) Dr. Boyake noted that Jones was comfortable during the exam, but prescribed him Meloxicam (Mobic) and Carbamazepine (Tegretol) for Jones's complaints of pain. (*Id.* (citation omitted).) "Mobic is an NSAID commonly prescribed for pain and inflammation. Tegretol is an anticonvulsant that is also used to treat nerve pain." (*Id.*) On May 11, 2015, Defendant Gujral met with Jones again but "[b]ecause Dr. Boyake had prescribed Jones medication for abdominal and leg pain, Defendant Gujral did not prescribe Jones any additional medications." (*Id.* ¶ 27 (citing Med. Rec. 69).)

On June 16, 2015, Jones complained to Defendant Gujral of pain and swelling in both legs. (*Id.* ¶ 29.) Defendant Gujral examined Jones and noted that he had mild swelling of his feet but no calf tenderness. (*Id.*) Jones's toenails were enlarged and were clipped. (*Id.*) Defendant Gujral ordered antiembolic stockings to reduce foot swelling. (*Id.*) Defendant Gujral also advised Jones to lose weight and referred him to physical therapy to assist him with walking. (*Id.* (citation omitted).) Jones was approved for ten physical therapy sessions. (*Id.* ¶ 29 (citing Med. Recs. 65, 79, 80).) On July 2 and 7, 2015, Jones refused to attend his physical therapy sessions. (*Id.* (citing Med. Recs. 65, 79, 80).) On July 21, 2015, Defendant Gujral renewed Jones's Vitamin D, and ordered Tylenol, insulin and a multivitamin for Jones. (*Id.* ¶ 30

(citing Med. Recs. 53–57, 60, 63).) On July 22, 2015, Jones saw Dr. Boyake who prescribed Zanaflex (a muscle relaxant) and the NSAID Mobic. (*Id.*)

On August 10, 2015, Defendant Gujral saw Jones for the last time. (*Id.* ¶ 33 (citing Med. Rec. 51–52).) During this visit, Jones refused a finger stick to check his blood sugar. (*Id.*) Defendant Gujral adjusted his insulin, and discontinued Jones's physical therapy sessions because he had not attended seven sessions.[11] (*Id.* (citing Med. Rec. 52).) On August 14, 2015, Defendant Gujral renewed Jones's artificial tears, Zanaflex, Isosorbide, and Tegretol. (*Id.* (citing Med. Rec. 49).)

Overall, the uncontroverted evidence establishes that Defendant Gujral was not deliberately indifferent to Jones's symptoms of joint pain, swelling, and stiffness. To the contrary, Defendant Gujral and other doctors at Sussex II regularly provided care for Jones's joint pain, swelling, and stiffness, including a variety of vitamins, supplements, pain medications, x-rays, lab work, physical therapy sessions, and antiembolic stockings. Jones fails to suggest what more Defendant Gujral should have done to treat his symptoms. At most, Jones has alleged a disagreement with the course of treatment provided to him by Defendant Gujral for his joint pain, stiffness, and swelling. *See Wright*, 766 F.2d at 849 (citation omitted). But "whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). In all, Jones was provided a plethora of medications and treatments to investigate and treat his joint pain, swelling, and stiffness, and he fails to establish that Defendant Gujral's care was so inadequate as to constitute extreme deprivation. *See id*; *see De'Lonta*, 330 F.3d at 634. Jones also fails to produce evidence that Defendant Gujral

---

[11] Jones avers that the reasons he did not attend his physical therapy sessions are because he is "in [his] 80's, bound to a wheelchair, obese[], and incapable." (Jones Aff. 1.)

subjectively recognized that the treatments for Jones's joint pain, swelling, and stiffness were inadequate. *Heyer*, 849 F.3d at 211–12. Thus, the record establishes that Defendant Gujral was not deliberately indifferent to Jones's joint pain, swelling, and stiffness. Claim 2(b) will be DISMISSED.

### iii.    Swollen Saliva Glands

Next, in Claim 2(c), Jones complains that Defendant Gujral was deliberately indifferent to his swollen saliva glands as a result of his Sjögren's Syndrome. (Compl. 4.) As is the case with his other claims, this claim lacks merit.

On October 18, 2014, Jones first complained to Defendant Gujral of "pain in his jaw." (Gujral Decl. ¶ 18 (citing Med. Rec. 98).) Defendant Gujral examined Jones and determined that the opening and closing of his jaw was normal, although he was tender at the temporo-mandibular joint. (*Id.*) Defendant Gujral specifically checked Jones's lymph nodes but found they were not enlarged in his neck, nor did Jones have any face swelling. (*Id.*) Defendant Gujral ordered a test for sed rate, "a non-specific blood test that can reveal inflammatory activity in the body," and increased Jones's dosage of Lasix. (*Id.* (citing Med. Rec. 96).) On November 7, 2014, Defendant Gujral determined Jones's sed rate was marginally high but not significant. (*Id.* (citing Med. Rec. 6).)

On December 1, 2014, Defendant Gujral saw Jones for a follow-up for his complaints of swollen glands. (*Id.* ¶ 19 (citing Med. Rec. 92).) During this visit, Jones complained of, among other things, swelling of his facial glands. (*Id.*) Defendant Gujral examined Jones, but did not find Jones's lymph nodes to be enlarged. (*Id.*) Nonetheless, on December 3, 2014, Defendant Gujral submitted requests for gastroenterology and oral surgery consults for Jones to address his

difficulty swallowing. (*Id.*) However, Defendant Gujral's request for an oral surgery consult was subsequently denied. (*Id.* ¶ 20.)

On January 7, 2015, Jones met with gastroenterologist Dr. Rashid and complained of, among other things, difficulty swallowing. (*Id.* ¶ 21 (citing Med. Rec. 85).) Dr. Rashid noted Jones's right parotid gland was swollen, "diagnosed dysphagia secondary to Sjögren's Syndrome and recommended an upper gastrointestinal endoscopy (EGD) to look for mechanical causes of dysphagia," and recommended increased hydration with meals. (*Id.* (citing Med. Rec. 85).) Defendant Gujral explains that "[m]ild patroti[d] gland swelling will not cause any difficulty in swallowing." (*Id.*)

On March 31, 2015, Defendant Gujral saw Jones for his complaints related to his Sjögren's Syndrome and performed a physical examination. (*Id.* ¶ 25.) Defendant Gujral found Jones's lungs to be clear, did not find any swelling in Jones's face or lymph nodes in his neck, and that Jones was not in acute distress during this exam. (*Id.*) On May 11, 2015, Jones saw Defendant Gujral again complaining of, among other things, pain in his lymph nodes. (*Id.* ¶ 28.) Defendant Gujral performed a physical exam of Jones, which was normal, and states that Jones was not in acute distress during this visit. (*Id.*) On June 16, 2015, Defendant Gujral saw Jones again for his complaints of, among other things, his glands. (*Id.* ¶ 29 (citing Med. Rec. 66).) Jones requested to see a specialist for his glands. (*Id.*) Defendant Gujral performed an examination of Jones and found no swelling in his face or neck. (*Id.*) Jones was not sent to a specialist for his swollen glands. (*See id.*)

The record establishes that Jones periodically complained to Defendant Gujral about "pain in his jaw," swollen saliva glands, or enlarged lymph nodes. (*See* Gujral Decl. ¶¶ 18, 19, 28 (citations omitted).) However, the record also establishes that when Defendant Gujral

examined Jones after each complaint, he did not find any facial swelling, swollen saliva glands, or enlarged lymph nodes. (*See id.* ¶¶ 18, 19, 25, 29.) At most, on one occasion, Defendant Gujral noted that Jones was tender at the temporo-mandibular joint. (*Id.* ¶ 18.) Despite his findings, Defendant Gujral ordered a sed rate test for Jones and requested that Jones be seen by a gastroenterologist and an oral surgeon, although only the gastroenterology appointment was approved. (*Id.* ¶¶ 18, 19 (citations omitted).) Jones visited Dr. Rashid, a gastroenterologist, who noted that Jones had swelling in his right parotid gland. (*Id.* ¶ 21 (citation omitted).)

In all, the evidence establishes that Defendant Gujral was not deliberately indifferent to Jones's swollen saliva glands. Defendant Gujral provided examinations and a sed test for Jones's complaints of "pain in his jaw" and swollen glands, and even requested that Jones be seen by a gastroenterologist and an oral surgeon. Moreover, although the gastroenterologist only noted that Jones had swelling in his right parotid gland, Defendant Gujral opines that, "[m]ild patroti[d] gland swelling will not cause any difficult in swallowing." (Gujral Decl. ¶ 21.) This appears to be the case for Jones as Dr. Rashid recommended increased hydration with meals.[12] Jones fails to suggest what more Defendant Gujral should have done to treat his swollen glands, and the record establishes that Defendant Gujral's treatments were not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851 (citation omitted). At most, Jones has alleged a disagreement with Defendant Gujral about the treatment he should receive for his swollen glands. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Jones also fails to produce evidence that Defendant Gujral subjectively recognized that his treatments for Jones's swollen saliva glands

---

[12] Dr. Rashid also recommended "an upper gastrointestinal endoscopy (EGD) to look for mechanical causes of dysphagia." (*Id.* ¶ 21 (citing Med. Rec. 85).) It is unclear from the record whether Jones ever received an EGD.

were inadequate. *Heyer*, 849 F.3d at 211–12. Therefore, the record establishes that Defendant Gujral was not deliberately indifference and Claim 2(c) will be DISMISSED.

### iv.    Skin Rashes and Dry Skin

In Claim 2(d), Jones complains that Defendant Gujral failed to adequately treat his various "skin rashes and dry skin," symptoms of his Sjögren's Syndrome. (Compl. 4.) To begin, the Court notes that Jones's bald complaints of dry skin and skin rashes fail to state a sufficiently serious medical need. *See Gonzalez-Reyna v. Ellis*, 2009 WL 2421482, at *3 (E.D. Va. July 27, 2009) (citation omitted). Moreover, at most, Jones complains of a disagreement with the treatment for his symptoms of dry skin and rashes. *See Wright*, 766 F.2d at 849 (citation omitted).

Prior to seeing Defendant Gujral, other doctors at Sussex II provided Jones with Benadryl, minocycline creams, and zinc oxide to treat his symptoms of Sjögren's Syndrome, and specifically, a small rash in his upper medial thighs and groin. (Gujral Decl. ¶¶ 8, 11 (citations omitted).) In July of 2014, Jones saw Defendant Gujral for the first time for complaints of a rash on his genitals and buttocks, although this rash was likely related to Jones's herpes, for which Defendant Gujral prescribed an antibiotic cream. (*Id.* ¶ 13; Mem. Supp. Mot Summ. J. 21.) On December 1, 2014, Defendant Gujral prescribed skin ointment for Jones's dry feet. (Gujral Decl. ¶ 16.) Neither Jones nor the record points to any other time that Jones complained of a skin rash or dry skin to Defendant Gujral or any other doctor at Sussex II. Rather, the record demonstrates that each time Jones complained to Defendant Gujral about a rash or dry skin, Defendant Gujral prescribed a reasonable treatment. *See McKeithan v. Beard*, No. 06–965, 2010 WL 2028091, at *5 (W.D. Pa. Apr. 12, 2010), *adopted by*, No. 06–965, 2010 WL 2028092 (W.D. Pa. May 21, 2010). Jones also fails to provide evidence that Defendant Gujral subjectively recognized that

the treatments for Jones's skin rashes and dry skin were inadequate. *Heyer*, 849 F.3d at 211–12. Therefore, Defendant Gujral was not deliberately indifferent. *See Miltier*, 896 F.2d at 851 (citation omitted). Claim 2(d) will be dismissed.

### v.    Prolonged Fatigue

In Claim 2(e), Jones complains of the "prolonged fatigue" associated with his Sjögren's Syndrome, and alleges that Defendant Gujral was deliberately indifferent to it. (Compl. 4.) The record, however, establishes otherwise.

To begin, a failure to adequately treat prolonged fatigue is likely not "sufficiently serious" to state an Eighth Amendment violation. *See Odighizuwa v. Ray*, No. 7:06cv185, 2006 WL 3041266, at *4 (W.D. Va. Oct. 24, 2006) (citation omitted) ("[H]eadaches, fatigue, itchiness, sneezing, chest pains, occasional vomiting, and emotional distress [] are not sufficiently serious to rise to the level of an Eighth Amendment violation."); *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (holding that an inmate failed to state a claim under the Eighth Amendment, since his complaints of breathing problems, chest pain, dizziness, sinus problems, headaches, and fatigue were "objectively speaking, relatively minor"). Further, Defendant Gujral was not deliberately indifferent to Jones's fatigue.

On March 31, 2014, Jones complained to Dr. Tesemma about "weakness," for which Dr. Tesemma prescribed Norvasc and Lasix, approved a wheelchair pass, and ordered chest x-rays, renal lab work, and a renal ultrasound. (Gujral Decl. ¶ 9 (citation omitted).) Exactly one year later, on March 31, 2015, Jones similarly complained to Defendant Gujral about weakness, "being unable to walk," and pain in the back of both of his legs. (*Id.* ¶ 25 (citation omitted).) Jones reviewed the patient's lab work, ordered x-rays of his knees, explained exercises he could

do for his legs, and provided Jones with Tylenol for his pain because it "would be safer on [Jones's] stomach tha[n] an NSAID." (*Id.* (citation omitted).)

Jones fails to identify and the record does not reflect an occasion where Jones informed Defendant Gujral that he was suffering from fatigue as a symptom of his Sjögren's Syndrome. Nonetheless, the record establishes that Defendant Gujral did anticipate that fatigue may be a severe side-effect of potassium deficiency, which in itself can be caused by kidney disease— another ailment of Jones's. (*See id.* ¶ 15.) To treat Jones's potassium deficiency, Defendant Gujral prescribed potassium supplements. (*Id.* (citation omitted).) Further, to counter hyperkalemia, a result of too much potassium, Defendant Gujral also prescribed sodium bicarbonate. (*Id.* (citation omitted).) The record further establishes that at various times throughout his treatment, doctors at Sussex II adjusted Jones's potassium supplements in response to his elevated or decreased levels of potassium. (*See id.* ¶¶ 9, 15.)

The evidence establishes that Defendant Gujral was not deliberately indifferent to Jones's fatigue, either as a symptom of his Sjögren's Syndrome or as a result of his potassium deficiency. To the contrary, the evidence establishes that despite Jones's complaints to Defendant Gujral of only "weakness," Defendant Gujral anticipated fatigue may be a result of Jones's potassium deficiency, and so ordered potassium supplements. Jones fails to suggest what more Defendant Gujral should have done to treat his fatigue, and therefore only alleges a disagreement with his course of treatment. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Jones also fails to produce evidence that Defendant Gujral subjectively recognized that his treatment for Jones's fatigue was inadequate. *Heyer*, 849 F.3d at 211–12. Therefore the record establishes that Defendant Gujral was not deliberately indifferent to Jones's prolonged fatigue and Claim 2(e) will be DISMISSED.

### vi. Limited Mobility and Confinement to a Wheelchair

In Claim 2(f), Jones alleges that Defendant Gujral was deliberately indifferent to his limited mobility and confinement to a wheelchair. (Compl. 4.) But based on the facts before the Court, Defendant Gujral was not deliberately indifferent.

The record establishes that Jones was approved for a wheelchair pass after specifically requesting one. (Gujral Decl. ¶ 9 (citation omitted).) Further, Defendant Gujral ordered antiembolic stockings to help reduce Jones's foot swelling, advised Jones to lose weight, and submitted a referral to physical therapy to assist him walk with a walker. (*Id.* ¶ 30 (citing Med. Rec. 66).) Jones was approved for ten physical therapy sessions, but his appointments were eventually cancelled because he did not attend seven of the sessions. (*Id.* ¶¶ 29, 33 (citations omitted).) Although Jones avers that he missed his physical therapy because of he is "in [his] 80's, bound to a wheelchair, obese[], and incapable" (Jones Aff. 1), this does not establish that Defendant Gujral was deliberately indifferent to his limited mobility. Jones provides no argument as to why Defendant Gujral's care for his limited mobility is inadequate or how his confinement to a wheelchair constitutes Defendant Gujral's deliberate indifference.[13] At most, Jones has alleged a non-constitutional disagreement with Defendant Gujral over the proper medical treatment for his limited mobility. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Accordingly, Claim 2(f) will be DISMISSED.

### vii. Constant Pain and Discomfort

Finally, in Claim 2(g), Jones complains of the "constant pain and discomfort . . . [which] prohibit[s] him from enjoying the normal 6 to 7 hours of undisturbed sleep." (Compl. 4.) "[W]hether and how pain associated with medical treatment should be mitigated is

---

[13] To the contrary, the United States Court of Appeals for the Fourth Circuit has stated that a *failure* to provide an inmate with a wheelchair may constitute deliberate indifference to a serious medical need. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995).

for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592. As detailed extensively herein, Jones has been provided a plethora of treatments for the pain associated with his Sjögren's Syndrome including, aspirin, Motrin, Tylenol, Norvasc, Mobic, and Tegretol. Although Jones vaguely complains that despite these various treatments, he is still in "constant pain and discomfort," he fails to demonstrate an extreme circumstance that requires judicial interference with his current regiments. *See id.* When viewing the record in the light most favorably to Jones, no reasonable trier of fact could agree that Jones's treatment for his "constant pain and suffering" constitutes an Eight Amendment violation. Again, Jones simply alleges a disagreement with his course of treatment. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Moreover, Jones also fails to produce evidence that Defendant Gujral subjectively recognized that his treatment for Jones's pain was inadequate. *Heyer*, 849 F.3d at 211–12. Claim 2(g) will be DISMISSED.

### D.    Claim 3

In Claim 3, the Court construes Jones to allege that Defendant Gujral acted with deliberate indifference by failing to refer Jones to a specialist to treat Jones's symptoms related to his Sjögren's Syndrome. (Compl. 5.) However, the record belies Jones's allegation.

The record establishes that on at least one occasion, Defendant Gujral requested that Jones be sent to a gastroenterologist and an oral surgeon to address his various ailments, although only his request for a gastroenterologist was approved.[14] (Gujral Decl. ¶ 20 (citation omitted).) Jones fails to demonstrate that Defendant Gujral was deliberately indifferent to his medical conditions by failing to refer him to additional specialists for his symptoms. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("Matters that traditionally fall within the scope of

---

[14] The record also establishes that at various times, Jones requested to be sent to a hospital for evaluation (Gujral Decl. ¶¶ 16, 19, 34), and on at least one occasion, Jones was sent to the hospital for pain in his chest. (*Id.* ¶ 30.)

medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992))). Again, at most, Jones states a disagreement with Defendant Gujral with respect to the appropriate course of treatment for his symptoms of Sjögren's Syndrome. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Accordingly, Claim 3 will be DISMISSED.

## V.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 46) will be GRANTED. Jones's claims and the action will be DISMISSED.

An appropriate Order shall accompany this Memorandum Opinion.

Date:  7/16/18
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge